**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN M. CASEY,            ) | |
|                 ) | |
|     **Plaintiff,**       ) | |
|                 ) | |
|   **v.**              ) | **Case number 4:05cv1408 TCM** |
|                 ) | |
| JO ANNE B. BARNHART,   ) | |
| **Commissioner of Social Security,** ) | |
|                 ) | |
|     **Defendant.**     ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying the application of John M. Casey for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court[1] for a final disposition. Mr. Casey ("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer.

## Procedural History

Alleging a disability since August 12, 1999, caused by spine problems, degenerative disc disease, cervical spine disease, arthritis, tendinitis, and nerve damage, Plaintiff applied in April 2003 for DIB. (R. at 46-48.[2]) His application was denied initially and after a

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

hearing held in September 2004 before Administrative Law Judge ("ALJ") James Griffith.[3] (Id. at 8-20, 22, 38-41, 322-46.)  The Appeals Council then denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 2-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he was born on June 14, 1952, and was then 52 years old.  (Id. at 325.)  He had completed the twelfth grade.  (Id.)  He was single and had four grown children.  (Id. at 335-36.)  He lived alone in a house.  (Id. at 336.)

Plaintiff last worked in 1999.  (Id. at 325.)  He had done farm work for the preceding approximately two and one-half years.  (Id.)  Before that he had been in the United States Coast Guard for thirteen and one-half years.  (Id. at 326.)  Before the Coast Guard, he had been in the Navy for six and one-half years.  (Id.)  He had retired from military service in June 1992.  (Id.)

When doing farm work, he had fed and watered the farm owner's horses, mowed, fed cattle during the winter, fixed fences, drove the tractor for some work, and did some painting.  (Id. at 326-27.)  This was a full-time job.  (Id. at 327.)  He left the job in 1999 after he and the owner had a disagreement about how long it should take Plaintiff to do some jobs and about what he wanted to lift.  (Id.)  Plaintiff was then having difficulties lifting and

_____

[3]A prior application for DIB was denied in October 1997 following a hearing.  (Id. at 93.)

carrying the bales of hay.  (Id.)  The owner also did not like it if he saw Plaintiff sitting

down.  (Id. at 328.)  Plaintiff would have to sit four or five times a day for at least fifteen

minutes. (Id.)  When driving the tractor over rough ground, Plaintiff would have to stop and

walk around to relieve his back pain.  (Id.)  He had difficulty steering at times because of

pain and numbness in his hands.  (Id. at 328-29.)  Pain in his hands also occasionally caused

him problems when he was fixing fences.  (Id. at 329.)

Plaintiff had been a gunner's mate in the Coast Guard.  (Id. at 330.)  This required that

he spend most of his time on his feet on a steel deck.  (Id.)  Items he had to lift varied from

a tool weighing a pound to a case of ammunition weighing 100 pounds.  (Id.)  During the

year prior to his discharge in 1992, he was on light duty because of the problems with his

hands.  (Id.)  Light duty was sitting behind a desk, handing out medical supplies, and lifting

nothing heavier than five pounds.  (Id. at 344-45.)  It was recommended that he be

discharged for medical problems.  (Id. at 330.)  At the time of the hearing, he had a 100 per

cent disability rating from the Veterans' Administration ("VA").  (Id. at 331.)

Asked by his attorney to list the problems he was having before his insured status

ended in December 2000, Plaintiff testified that, in addition to the problems with his hands,

he had pain in his lower back; pain in his left hip that radiated down his leg; problems with

popping in both knees, particularly in his left knee; and problems with his neck that caused

him headaches if he twisted his head.  (Id. at 332.)  Additionally, he is a diabetic and has

problems moving his right arm.  (Id.)  He cannot raise that arm past his waist and cannot

throw with that arm because of pain in his shoulder.  (Id. at 333.)

On an increasing scale from one to ten, his worst pain was a ten.  (Id.)  This pain could be caused by something as simple as bending over a sink.  (Id.)  Pain in his back prevented him from sleeping well.  (Id.)  Bending his knees caused him pain.  (Id. at 334.)  The VA had given him knee braces to wear and he wore these constantly except when sleeping.  (Id. at 334.)  The pain in his hands started his last two years in the military.  (Id.)  He cannot turn his neck to the right or left as far as he used to and cannot raise his head up as high as he used to.  (Id. at 335.)  He sometimes has headaches that can last as long as three weeks.  (Id.)

Asked by his attorney to describe his daily activities before December 2000, Plaintiff testified that he would vacuum for ten to fifteen minutes and then would have to sit down.  (Id. at 337.)  Because of the pain in his hands, he would cook only one meal each day – bacon and eggs for breakfast – and used paper plates.  (Id. at 338.)  He had to limit the time he spent grocery shopping to thirty minutes because walking caused his lower back and left hip to hurt.  (Id. at 338-39.)  He had difficulty bending over a grocery cart.  (Id. at 341.)  He began using a riding lawn mower; it took him two days to mow his yard because the bouncing of the mower aggravated his lower back.  (Id. at 339.)  The problems he has holding a steering wheel existed before the end of 2000.  (Id. at 340.)  At that time, he could lift a twenty-pound bag of dog food out of his car, but would have to "basically drag" it into the house.  (Id. at 342.)  He could not sit for long without having to shift positions or walk.  (Id. at 343.)

Before the end of 2000, Plaintiff tried fishing but could not hold the rod and reel for longer than ten to fifteen minutes.  (Id. at 339.)  He stopped fishing and stopped playing sports.  (Id. at 340.)  The last time he was able to play sports without difficulty was in 1989.  (Id. at 344.)  The farthest he could walk was to his mailbox at the end of the road, an approximately five minute round trip.  (Id. at 342.)

The difficulties with his lower back, neck, and hands have become worse.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, and medical records from the VA.

Plaintiff indicated on a "Disability Report Adult" that he was 5 feet 8 inches tall and weighed 210 pounds.  (Id. at 84, 97.)  His various impairments first bothered him on August 12, 1999, and caused him to be unable to work as of that day.  (Id. at 85, 98.)  In his prior job as a gunner's mate, he frequently lifted 25 pounds.  (Id. at 86, 99.)

When Plaintiff applied for DIB, the interviewer did not observe him have any difficulties in sitting, standing, or walking.  (Id. at 94.)  The interviewer noted, "[Plaintiff] let me know that he should receive Social Security DIB as well [as VA disability].  He was a poor historian and he did have an attitude problem."  (Id.)

Plaintiff reported in a claimant questionnaire that every day he had pain in his lower back, hands, knees, and legs; numbness in his legs and hands; and a loss of motion in his right arm.  (Id. at 79.)  He had difficulty sleeping because he had to get up at different times.

(Id. at 80.) He had difficulty preparing meals, but did not describe how. (Id.) Asked to describe any household chores that he could do, he simply reported that he did what he could and stopped when it hurt. (Id. at 80-81.) Asked how often he left his house, where he went when he did go out, and for how long, he answered, "as needed" and "where needed." (Id. at 81.) Asked to describe any problems he had in managing money, he replied, "none of your business." (Id.) He did not answer at all some questions, for instance, to describe any changes he had in getting along with family and friends, any difficulties he had in using a telephone, or any activities. (Id. at 82.)

In April 2003, the VA decided to grant Plaintiff total disability. (Id. at 56-61.) The evidence before the VA was Plaintiff's VA medical records from January 8, 2002, through April 3, 2003, the previous rating decision, and the evidence on which that decision was based, including medical records dated June 20, 2000.[4] (Id. at 57.) It was noted in the decision that Plaintiff had to "miss[] a lot of work because of the need for frequent treatment" when he worked on a farm. (Id.) His disability rating included a 40 percent disability caused by lumbosacral spine degenerative joint and disc disease, a 30 percent disability caused by cervical spine degenerative joint and disc disease, a 10 percent disability caused by a residual right wrist fracture with arthritis and tendinitis, a 10 percent disability caused by tinnitus, a 10 percent disability caused by a residual nose fracture, and a 10 percent disability caused by left elbow tendinitis. (Id. at 59.) Each of these disabilities was described as service

[4]This previous decision is not in the record.

connected.  (Id.)  A bilateral knee condition, tendinitis and arthritis in his hands, and diabetes mellitus were not service connected.  (Id. at 60.)

An earnings report generated for Plaintiff listed annual income in increasing amounts until 1992.  (Id. at 42.)  His income for 1992 was approximately one-half the income for 1991.  (Id.)  He had no income for the years from 1993 to 1996, inclusive.  (Id.)  His annual income for 1997 was $5,418; for 1998 was $7,712; and for 1999, the last year included, was $4,310.  (Id.)  He was in the military, including his service with the Coast Guard, for twenty years.  (Id. at 36.)

The chronology and substance of Plaintiff's medical treatment, always with the VA,[5] is as follows.[6]

The records begin with a June 7, 1994, visit to the VA's physical medicine rehabilitation clinic for complaints of low back pain since 1988 and bilateral knee pain for several years.  (Id. at 320.)  The back pain occurred when Plaintiff was at work, including light house work, and at rest.  (Id. at 318.)  It was better when he was sitting or lying down. (Id.)  X-rays of his knees were normal.  (Id. at 317.)  X-rays of his lumbosacral spine revealed Grade I spondylolisthesis (the forward movement of one vertebra in relation to an adjacent vertebra) at L5 and a significant narrowing of the disc space at L5-S1.  (Id. at 316.) He was subsequently referred to the psychology department.  (Id. at 315.)  Following a

[5]Plaintiff attended the VA hospital and clinics at both Columbia, Missouri, and St. Louis, Missouri.

[6]The VA medical records also include those relating to an allergic rash and dental surgery. These conditions are not at issue.

telephone interview with a psychologist, he was scheduled to be admitted to the pain management program in October.  (Id.)

On October 11, Plaintiff was admitted to the in-patient pain management program at the VA hospital for ten days.  (Id. at 306-08.)  This program was to include a computerized tomography ("CT") scan, an electromyogram ("EMG"), a nerve conduction study, and transcutaneous electrical nerve stimulation to determine the cause of his chronic low back pain.  (Id. at 306.)  On physical examination, he displayed "high pain behaviors" and had a decreased range of motion in his lumbosacral spine.  (Id. at 306.)  Heel-toe walk was normal.  (Id.)  His upper extremity grip and motor strength were 5/5; his lower extremities were 4/5 with knee flexion.  (Id.)  His rheumatoid factor was negative.  (Id. at 307.)  The upper extremity EMG was negative for carpal tunnel syndrome and neuropathy.  (Id.)  During his stay, he participated in therapy and exercise to a moderate degree.  (Id.)  He was difficult to assess by the physical therapy and occupational therapy departments, however, "due to [his] perceived ambivalence to treatment participation."  (Id.)  Physical therapy goals included a trial with a transcutaneous electrical nerve stimulation ("TENS") unit, patellar taping for his left knee pain, strengthening exercises, and proper body mechanics.  (Id.)  These goals were not met.  (Id.)  His diabetes was controlled with diet.  (Id.)  Although he was not depressed, his coping strategies were negative.  (Id.)  He was described as "self-involved" and wanted an increase in disability.  (Id.)  He did well with relaxation exercises.  (Id.)  It was thought that he could improve on discharge.  (Id. at 307-08.)

Plaintiff attended the orthopedic clinic on December 22 for complaints of bilateral knee pain. (Id. at 311.) X-rays of Plaintiff's knees were normal. (Id. at 304.)

Plaintiff was referred to physical therapy. The therapist discussed with Plaintiff taping his knees to correct his alignment. (Id. at 305.) Plaintiff refused, saying it had been tried before. (Id.) He was shown a hamstring stretch. (Id.) The therapist concluded that she was unable to appropriately treat Plaintiff because of his refusal to try taping and discharged him from physical therapy. (Id.)

On April 24, 1995, Plaintiff consulted the orthopedic clinic for complaints of low back pain. (Id. at 301.) He reported that the pain had significantly increased during the past ten years. (Id.) Because of the pain, he could not tolerate any exercise. (Id.) Tests were ordered. (Id.) Three days later, a myelogram of his lumbar spine revealed a Grade II spondylolysis at L5 and spondylolisthesis at L5-S1 with severe disc degeneration. (Id. at 298.) A CT scan confirmed the bilateral spondylolysis at L5 and the spondylolisthesis at L5-S1 and also revealed a small central/left herniated nucleus pulposus with lateral recess stenosis and probable nerve root impingement. (Id. at 297.)

At a June 7 visit to the physical medicine rehabilitation clinic, the range of motion in Plaintiff's spine was 25% of normal when extending or flexing. (Id. at 294.) He reported that the chronic management pain program had helped to some degree but had not reduced his disability or increased his exercise tolerance. (Id.) He could not lift or bend. (Id.) The treatment plan was to refer him to the neurology clinic and reevaluate him for a service-

connected disability.  (Id. at 295.)  He was to return in five months and was to continue his exercise program as able.  (Id.)

X-rays taken on July 27 of Plaintiff's thoracic spine and of his hands were normal. (Id. at 291-92.)

Four days later, complaining of hand pain, Plaintiff went to the orthopedic clinic.  (Id. at 287-88.)  He had no complaints of knee pain.  (Id. at 287.)  He described the hand pain as increasing when he engaged in such activities as picking things up or using machines.  (Id.) He had had occupational therapy.  (Id.)  On examination, his grip was strong and there was no atrophy.  (Id.)  It was noted that Plaintiff wanted disability.  (Id.)  An EMG and nerve conduction study were to be scheduled.  (Id.)  If they were negative, occupational therapy would be considered.  (Id. at 288.)  He was to return in three months.  (Id.)

Plaintiff consulted the neurology clinic on September 14 for his low back pain.  (Id. at 285.)  The pain was worse with activity and could be reproduced with coughing.  (Id.) The physician concluded that Plaintiff would benefit from fusion surgery or a possible diskectomy.  (Id.)  He was to return in two months; a decision whether to operate would be made then.  (Id.)

On October 30, Plaintiff was seen again at the orthopedic clinic for his hand pain.  (Id. at 283-84.)  He had no wrist, forearm, elbow, or shoulder pain.  (Id. at 283.)  He had hurt his hands in a motorcycle accident.  (Id.)  It was noted that a sensory examination and nerve conduction study were both within normal limits.  (Id.)  The physician concluded that the results of the cervical magnetic reasonance imaging ("MRI") and EMG were needed before

a diagnosis could be made. (Id. at 284.) Plaintiff was told to bring these results to the next clinic. (Id.)

A subsequent MRI of Plaintiff's cervical spine revealed degenerative disc disease at C5, C6, and C6-7; there was no evidence of cord compression. (Id. at 303.) X-rays of his right forearm and wrists were normal. (Id. at 302.)

Plaintiff returned to the neurology clinic on November 16 for his complaints of low back pain. (Id. at 282.) The pain had increased since his last visit. (Id.) X-rays of Plaintiff's lumbar spine revealed Grade II spondylolisthesis of L5-S1. (Id. at 280.) An MRI was ordered for December 8. (Id. at 282.) Surgery was not discussed.

Plaintiff was seen again at the orthopedic clinic on December 4 for his bilateral hand pain. (Id. at 278-79.) It was noted that his two previous EMG and nerve conduction studies were negative. (Id. at 278.) Plaintiff reported that his whole hand hurt with intermittent numbness. (Id.) He had difficulty picking up things and writing; the pain was worse with activity. (Id.) On examination, he had no atrophy or swelling. (Id.) The diagnosis was of bilateral diffuse hand pain of uncertain etiology. (Id.)

On January 4, 1996, Plaintiff presented to the neurosurgery clinic with complaints of low back pain radiating down his legs and increasing with walking and of pain in both hands. (Id. at 277.) The impression was of a degenerative disc disease at L5-S1 and possible carpal tunnel syndrome. (Id.) He was to be referred for an EMG. (Id.)

An MRI of Plaintiff's lumbar spine was performed on January 8. (Id. at 270.) The impression was of degenerative changes with Grade I spondylolisthesis at L5-S1 and

narrowing of the L5-S1 neural foramina and of bulging annulus at L4-5.  (Id.)  The notes of the rheumatology clinic on February 2 indicate that Plaintiff did not have a rheumatic disease.  (Id. at 274.)  It "appear[ed] that . . . chronic pain management approach offer[ed] best possibility."  (Id.)

An x-ray of Plaintiff's cervical spine on March 7 revealed degenerative joint disease at C6-C7.  (Id. at 266.)  A nerve conduction study showed no evidence of carpal tunnel syndrome.  (Id. at 272.)  That same day, he was seen at a clinic for his hand pain.  (Id. at 268-29.)  He described this pain as involving the entire hands up to the wrists.  (Id. at 268.)  There was also numbness, which was worse with driving, when working with his arms above his head, and at night.  (Id.)  The pain came with any strenuous activity with his hands.  (Id.)  Splints had helped.  (Id.)  The physician described Plaintiff as having "difficult problems to pin down."  (Id. at 269.)  He had symptoms consistent with carpal tunnel syndrome, but the tests were negative.  (Id.)  Some of his symptoms were consistent with thoracic outlet syndrome.  (Id.)  Plaintiff was referred to the cardiothoracic surgery department for evaluation of that possible syndrome.  (Id. at 267, 269.)

On May 3, a notation was made in the physical therapy department that Plaintiff had been shown some stretching exercises.  (Id. at 264-65.)  He would exercise on his own.  (Id.)

On September 3, Plaintiff was given a cervical traction unit and was shown how to use it.  (Id. at 257-58.)  A few weeks later, he attended a clinic and was described as having a history of upper and lower back pain and symptoms of carpal tunnel syndrome.  (Id. at 255.)  His low back pain increased with movement.  (Id. at 256.)  He was given a collar to

wear for three weeks and was to continue on medication.[7]  (Id.)  He was to return in six

months.  (Id.)

At the next clinic visit, on October 22, it was noted that Plaintiff's symptoms were

unchanged after two weeks of physical therapy.  (Id. at 254.)  After that therapy, he was seen

in the neurology and plastic surgery clinics for possible carpal tunnel release surgery.  (Id.

at 254, 259, 261.)  The surgery was not recommended.  (Id. at 254, 262.)  Indeed, the plastic

surgeon had concluded that Plaintiff did not have any suggestion of pathology from his

elbows and below and had discharged him from the plastic surgery clinic.  (Id. at 261.)  His

EMG was normal, and he had no clinical signs of thoracic outlet syndrome.  (Id. at 254.)

Noting that Plaintiff continued to have pain in his back and neck and that he had

previously been "not totally successful" in chronic pain management program, his physician

asked on January 22, 1997, for a psychological consult to determine if his chances of success

had improved.  (Id. at 253.)  The physician opined that Plaintiff's "best bet" was to stretch

and exercise.  (Id.)

Carole B. Bernard, Ph.D., a staff psychologist, performed a psychological evaluation

of Plaintiff on February 6.  (Id. at 250-51.)  Plaintiff reported at the interview that he was

receiving a 60 percent VA disability, had previously applied for DIB and been denied, and

had reapplied.  (Id. at 250.)  He expressed frustration with the VA health care providers for

not listening to his complaints of pain.  (Id.)  He wanted to attend the chronic pain

_____

[7]The names of the medications are illegible.  They are not, however, the medications he was
taking at the time of the hearing.

management program in order to show the providers that his motor vehicle accidents in 1988 had contributed to his pain and to be diagnosed with carpal tunnel syndrome. (Id.) He explained that although he had not been hospitalized after the accidents, both hands and his right arm were in casts after the second accident. (Id.) On a scale from one to ten, his pain was usually a ten. (Id.) Standing, bending, and twisting intensified his pain; sitting lessened it. (Id.) He no longer could ride motorcycles or horses or paddle a canoe. (Id.) Physical therapy exercises, a TENS unit, and using a pillow between his legs had all not helped. (Id.) Vocational rehabilitation would not be helpful because he could no longer engage in work he really enjoyed. (Id.) Dr. Bernard concluded that Plaintiff did not appear to be a good candidate for the chronic pain management program. (Id. at 251.) He might, however, benefit from relaxation techniques and was offered relaxation sessions on a biweekly or monthly basis. (Id.) There is no record of Plaintiff attending such sessions.

On March 17, Plaintiff went to a VA clinic, reporting a history of degenerative joint disease, multiple motor vehicle accidents, complaints of neck and low back pain, and carpal tunnel syndrome. (Id. at 247.) An EMG had been negative. (Id.) He was referred to the orthopedic clinic; prescribed Tylenol, and told to return in one year. (Id. at 248-49.)

Consequently, Plaintiff consulted the orthopedic clinic on April 21 for his hand pain, numbness, and tingling. (Id. at 245-46.) He was unable to work due to the pain. (Id. at 245.) He had splints he used at night and while working; they helped. (Id.) On examination, Plaintiff displayed no point tenderness, swelling, atrophy, or diminished strength in his hands. (Id.) It was noted that the findings of a cervical spine examination and

x-ray were not consistent with nerve root compression.  (Id. at 246.)  His referral to the orthopedic clinic was discontinued.  (Id.)

On May 19, Plaintiff was seen at another clinic for complaints of hand pain and an evaluation for carpal tunnel syndrome.  (Id. at 243-44.)  Again, it was noted that the findings of a cervical spine examination and x-ray were not consistent with nerve root compression.  (Id. at 243.)  On examination, Plaintiff again displayed no point tenderness, swelling, atrophy, or diminished strength in his hands.  (Id.)  The impression was of unknown etiology for the hand pain, rule out conversion disorder.  (Id. at 244.)  Plaintiff was to continue using night splints and taking Tylenol and was referred to rheumatology clinic and back to the physical medicine rehabilitation clinic.  (Id. at 243-44.)

At his next clinic visit, on September 30, Petitioner reported that traction helped his cervical disc bulge.  (Id. at 242.)  His sleeping problems remained.  (Id.)  He was not doing any aerobic exercises and was described as being "tight" because he did not stretch enough.  (Id.)  The health care provider encouraged Plaintiff to do aerobic exercises, e.g., fast walking or bicycling, but predicted that he might revert to a sedentary life style.  (Id.)

On October 31, Plaintiff reported to the attending physician at the rheumatology clinic that the numbness, pain, and weakness in his right hand had begun in 1982 and in the left hand years later.  (Id. at 240.)  The pain was exacerbated by a motor vehicle accident in 1988 when he broke a bone in his right arm and had casts on both arms.  (Id.)  The pain in his hands made it difficult for him to sleep, and his low back pain made it worse.  (Id.)  Additionally, he occasionally had pain in his cervical spine.  (Id.)  He took 12 Tylenol a day

for the low back pain. (Id.) He was described as being borderline diabetes mellitus. (Id.) The physician concluded that Plaintiff had symptoms and physical examination findings consistent with thoracic outlet syndrome. (Id. at 241.) He would suggest a referral to vascular surgery and would refer Plaintiff back to his primary care physician for further evaluation. (Id.)

At a clinic visit the next week, on November 7, Plaintiff described a long history of using heavy equipment and repetitive movements. (Id. at 238-39.) He also had a history of tingling, numbness, and pain in both his hands and forearms and occasionally in his shoulders. (Id. at 238.) On examination, he had a limited range of motion in his neck but not in his hands. (Id.) His symptoms could not be reproduced. (Id.) It was opined that degenerative joint disease and possibly peripheral neuropathy were causing the chronic upper extremity pain. (Id. at 238-39.) There was no evidence of thoracic outlet syndrome. (Id. at 239.) The plan was to optimize the treatment for his symptoms, to decrease traumatic activities, e.g., heavy equipment operation, and to develop a physical therapy approach. (Id.)

X-rays taken on February 21, 1998, of Plaintiff's right knee and lower leg, including his ankle, were normal except for a non-displaced fracture of his proximal fibula. (Id. at 198-200.)

At a clinic visit on March 11, Plaintiff reported that he had been able to do odd jobs and was going to welding classes. (Id. at 237.) His back symptoms were the same; he had pain in both hands when he sneezed. (Id.) The physician noted that these symptoms had been previously evaluated; it was opined that it was not carpal tunnel syndrome or

radiculopathy. (Id.) Plaintiff's chief complaint was of elbow and hand pain related to the use of his hands when welding and similar activities. (Id.) Strengthening exercises were prescribed. (Id.) Plaintiff was to return in six months. (Id.)

X-rays were taken on March 27 of Plaintiff's shoulders and wrists; all were normal. (Id. at 195-96.) X-rays of his cervical spine revealed degenerative disc changes, particularly at C6-C7. (Id. at 197.) X-rays taken three days later of Plaintiff's lower right leg showed a healing fracture of his proximal fibula. (Id. at 192.) X-rays taken the same day of his wrists and right forearm were normal. (Id. at 193-94.)

On April 20, Petitioner returned to the VA clinic with complaints of chronic, diffuse, muscular-skeletal pain. (Id. at 235.) He reported that he had been diagnosed with rheumatoid arthritis based on one blood test. (Id.) On examination, no deformities in his hands or wrists were seen, nor were there any rheumatoid nodules. (Id.) He was taking only Ibuprofen for his pain. (Id.) The physician noted that Plaintiff did not fulfill the criteria for a diagnosis of rheumatoid arthritis. (Id. at 236.) Weight loss was recommended, particularly for his knee pain. (Id.)

X-rays taken four days later of Plaintiff's cervical spine showed osteoarthritis. (Id. at 190.) X-rays of his dorsal spine were normal. (Id. at 191.) A chest x-ray on May 7 was normal. (Id. at 189.)

On July 31, the results of the nerve conduction study were reported to be normal. (Id. at 176.) An MRI of Plaintiff's cervical spine was recommended and a repeat in three months of a nerve conduction study of his ulnar nerves was recommended. (Id.)

Eight days later, Plaintiff's referral to occupational therapy was stopped afer he failed to keep an appointment and to reschedule.  (Id. at 176.)

An MRI of Plaintiff's cervical spine on August 25 showed minimal posterior osteophytes (bony outgrowths) at C5-C6 and C6-C7.  (Id. at 188.)  This finding was consistent with mild degenerative changes.  (Id.)

On November 24, Plaintiff went to the physical medicine rehabilitation clinic at the VA for complaints of pain in his hands, neck, and lower back.  (Id. at 231.)  He was unable to use his hands to do anything for any length of time.  (Id.)  He had multiple tender points. (Id.)  The impression was of myofascial pain, cervical disc herniation, and possible carpal tunnel syndrome.  (Id.)  Plaintiff was to continue his home exercise program and was to have an EMG of both upper extremities to rule out carpal tunnel syndrome.  (Id.)  A nerve conduction study performed in February 1999 showed no evidence of such.  (Id. at 227.)

Plaintiff went to the VA clinic on March 16, 1999, for complaints of low back pain radiating to his left leg.  (Id. at 226.)  He displayed a slight weakness in his lower extremities.  (Id.)  He reported that nothing helped the pain and that it was a ten plus on a ten-point scale.  (Id.)  He also had bilateral wrist pain for at least the past several years.  (Id.) On examination, he had at least a 75% restriction in his motion in all planes, particularly flexion.  (Id.)  An EMG was recommended, and he was referred to a physician for a lumbar epidural steroid injection.  (Id.)  His computerized history included a diagnosis of carpal tunnel syndrome, although the recent nerve conduction study had negated that diagnosis.  (Id. at 226-27.)

A splint was fashioned for Plaintiff's left elbow on April 22. (Id. at 174.)

On June 1, Plaintiff presented to the VA clinic with complaints of upper back and neck pain and of intermittent swelling in both hands. (Id. at 223.) It was noted that he had been last seen in the clinic three months before for low back pain. (Id.) At that time, a referral had been given for an epidural steroid injection; however, the doctor in charge of such had decided that an injection was not indicated. (Id.) Plaintiff had then been given a shot of Toradol, which had given him relief for approximately 24 hours. (Id.) It was noted that an EMG study of his upper and lower extremities was normal.[8] (Id.) He was given a prescription for another pain reliever and for a medication to help him sleep. (Id.) He was to continue his home exercise program and return in three to four months. (Id.)

Eight days later, Plaintiff went to the VA emergency room a few hours after feeling his left knee pop. (Id. at 174.) He had been in pain since and was walking with a pronounced limp. (Id.) X-rays of his left knee were normal. (Id. at 187.) There was no joint effusion, no dislocation or fracture, and no evidence of arthritic changes. (Id.) Two days later, Plaintiff reported that his left knee pain was increasing. (Id. at 173.) He was informed that the x-rays had not shown anything traumatic; he insisted something was wrong. (Id.) When moving, his pain was a five on a ten-point scale; when stationary, his pain was a one. (Id.) Subsequently, on July 22, Plaintiff had an MRI of his left knee. (Id. at 186.) The impression was of a tear in the medial meniscus. (Id.)

---

[8]This study and a nerve conduction study were performed on April 1, 1999. (Id. at 224-25.)

X-rays taken of Plaintiff's cervical spine on September 9 were normal with the exception of osteoarthritic changes at C6 and C7 with a narrowing of the disc space between the two. (Id. at 182.) X-rays of his lumbar spine revealed a two centimeter spondylolisthesis of L5. (Id. at 183.) X-rays of his left knee showed no fractures, dislocations, or bony destructions. (Id. at 184.) X-rays of his right knee showed a fracture of the proximal fibula with minimal displacement of the fracture fragments. (Id. at 185.)

On September 17, Plaintiff underwent arthroscopic surgery to repair the medical meniscus tear in his left knee. (Id. at 169-71.)

Two weeks later, Plaintiff went to the VA with a history of osteoarthritis and a "questionable" history of rheumatoid arthritis. (Id. at 220-21.) A June 1999 nerve conduction study and EMG of his low back were normal. (Id. at 220.) He had intermittent numbness in both feet. (Id.) He had full range of motion in his cervical spine, but did favor his left knee when walking. (Id.) The impression was of degenerative changes with Grade I spondylolisthesis at L5-S1 and a narrowing of the L-S1 neural foramina. (Id.) The physician concluded that Plaintiff would benefit from a stretching program, scapular stabilization, a lumbar stabilizing program, and aerobic exercises. (Id. at 221.) If he failed to do the exercises, his care would be turned back to his primary care physician. (Id.)

Two months later, on November 18, Plaintiff was to be evaluated at the physical therapy clinic for participation in the recommended programs. (Id. at 219.) He told the therapist that he wanted to be given some exercises "on paper" because he was not able to do anything that day. (Id.) He explained that he had pain in his left leg every morning that

went away on its own after three hours and that no position relieved his pain. (Id.) The therapist explained that he had to be evaluated in order to be given the correct exercise program. (Id.) He refused. (Id.) He was rescheduled for December. (Id.) There is no record of a December appointment.

Plaintiff reported at a February 9, 2000, visit to the physical medicine rehabilitation clinic that the pain in his knees, particularly his left knee, had not improved regardless of the surgery five months before. (Id. at 169.) He walked well, but had trouble getting out of a chair and lying down. (Id. at 167.) He was able to walk on his heels and toes. (Id.)

Plaintiff went to the VA on March 27. (Id. at 218.) He reported that he had been having trouble fishing because of the numbness and tingling in his right hand. (Id.) He also reported that he had had surgery on his right wrist and had recently had surgery on his left knee. (Id.) The latter was not helping; indeed, his knee was worse than before. (Id.) Additionally, he continued to have low back pain. (Id.) He refused physical therapy, explaining he was unable to do any back exercises because of his spondylolisthesis and bulging disc. (Id.) He walked for exercise. (Id.) He had been told recently at another VA hospital that he had an elevated rheumatoid factor. (Id.) On examination, his gait appeared to be symmetric although he used a walking stick when entering the room. (Id.) Plaintiff refused "any type of physical medicine intervention[.]" (Id.) He was given some exercises for his knee pain, but the physician concluded that it was unlikely that he would do them. (Id.) He was to be referred to the rheumatology clinic because of the reported elevated rheumatoid factor. (Id.) He was encouraged to continue walking. (Id.)

On May 5, Plaintiff attended the rheumatology clinic for his complaints of chronic pain in both hand for the past ten years. (Id. at 216-17.) The pain became worse with activity. (Id. at 216.) He had no history of fever, chills, or swelling in his joints. (Id.) He was alert and oriented times three and was in no apparent distress. (Id.) His vital signs were all within normal limits. (Id.) He had a full range of motion in his neck, shoulders, elbows, hands, hips, knees, and ankles. (Id.) And, he had intact muscle strength in his hands. (Id.) The physician found no signs of rheumatoid arthritis; Plaintiff's rheumatoid factor was negative. (Id. at 217.) On being informed by Plaintiff that his rheumatoid factor was positive at one time, the physician recommended that he be tested on an annual basis. (Id.)

After being examined at the orthopedic clinic on May 9 for discomfort in both knees, Plaintiff was fitted with a brace for his left knee. (Id. at 165-67.) His dosage of Metformin for his diabetes was increased. (Id. at 166.)

Plaintiff was seen at the physical medicine rehabilitation clinic on August 25. (Id. at 162-65.) Pain in his right knee was making it difficult for him to walk. (Id. at 164.) He was wearing the brace for his left knee and was walking slowly. (Id.)

Plaintiff was examined at the orthopedic clinic on September 7 for his discomfort in both knees. (Id. at 162.) The impression was of moderate chondromalacia (the progressive erosion of cartilage) and spondylolisthesis. (Id.) He was to be given a brace for his right knee, and was three weeks later. (Id.) X-rays of his right ankle were normal. (Id. at 181.)

Complaining of joint and low back pain, Plaintiff went to the physical medicine rehabilitation clinic on December 5. (Id. at 159-61.) He reportedly had had an operation in

1995 to remove cartilage from his left knee and one in 1985 to remove cartilage from his right wrist. (Id. at 161.) He walked slowly. (Id.) He was encouraged to diet and exercise, and was to continue his medications for diabetes. (Id.)

On February 5, 2001, Plaintiff was again seen at the physical medicine rehabilitation clinic for complaints of low back pain radiating into his buttocks and feet. (Id. at 157-59.) He had had this pain for at least ten years and attributed it to motorcycle accidents in 1988. (Id. at 159.) His discomfort when sitting or lying down was noted, and he could not raise either leg higher than ten degrees above horizontal. (Id.) He was given a 90-day supply of Autotelic for pain and of Metformin and Glyburide for diabetes. (Id.) A CT scan of his lumbar spine performed three weeks later showed bilateral sponylolysis at L5 and spondylolisthesis at L5-S1. (Id. at 180.) There was no evidence of spinal stenosis or disc herniation at L2 through S1. (Id.)

Complaining of discomfort in his right ankle and in both knees and reporting that he had undergone a resection of a tear in the meniscus of his left knee in September 1999, Plaintiff was examined at the orthopedic clinic on March 13. (Id. at 156-57.) He was then using a brace for both his knees. (Id.) The diagnosis was moderate chondromalacia in his knee and early degenerative disease. (Id. at 156.) Medications would be of some benefit and he was advised to continue wearing his braces. (Id.) As to his right ankle, Plaintiff was given the option of having a workup, including an MRI, or of wearing a brace. (Id.)

Plaintiff had an MRI of his right ankle on April 9. (Id. at 179.) The only problem revealed by the MRI was a small calcaneal cyst measuring six by four millimeters. (Id.)

On May 8, Plaintiff went to the physical medicine rehabilitation clinic for his diabetes and back discomfort.  (Id. at 152-55.)  He was alert and walked well, although with some discomfort when walking heel and toe.  (Id. at 153.)  He reported no feelings of depression or hopelessness; he had not had a lack of interest or loss of pleasure in doing things.  (Id. at 154.)  He was given a 90-day supply of Autotelic for pain and of Metformin for diabetes.  (Id. at 153.)

Plaintiff returned to the physical medicine rehabilitation clinic on August 21 with complaints of low back pain, sciatic pain in both legs for the past three years, and numbness in both hands.  (Id. at 150-52.)  He described his pain as being a five.  (Id. at 152.)  Asked about the onset and duration of his current pain, he simply replied that he "just hurts."  (Id.)  Asked what caused or exacerbated his pain, he refused to answer.  (Id.)  His back movements were "good" in his lower and cervical spines.  (Id. at 151.)  He was started on Gabapentin.  (Id.)  He was also given another 90-day supply of Autotelic.  (Id.)

On October 31, Plaintiff had a nutrition assessment.  (Id. at 149-50.)  His diet was found to be lacking in fruit and vegetables and high in concentrated sweet intake.  (Id. at 149.)  He was advised to reduce the sweet intake.  (Id.)  He was not exercising.  (Id.)

Plaintiff returned to the orthopedic clinic on December 11 to learn the results of the April MRI.  (Id. at 147.)  When told that the MRI revealed a four by six millimeter calcaneal cyst that the physician said was too small to do anything with, Plaintiff reportedly "became angry and yelled, asking if he had to live in pain for the rest of his life." (Id.)  Consequently, a guided cyst aspiration was to be ordered through radiology.  (Id.)  It was later noted that

the radiologist also felt the cyst was too small to drain.  (<u>Id.</u>)  It was decided to try a pair of soft orthotics to relieve the pain.  (<u>Id.</u> at 144.)  Plaintiff did not keep his appointment for the orthotics.  (<u>Id.</u> at 141.)

Plaintiff was seen at the physical medicine rehabilitation clinic on December 18 for complaints of low back pain and poorly controlled diabetes.  (<u>Id.</u> at 145-47.)  He had had the low back pain since a motorcycle accident in 1989.  (<u>Id.</u> at 146.)  He was able to move all his extremities well and could walk on his heels and toes.  (<u>Id.</u>)  He weighed 219 pounds and was described as obese.  (<u>Id.</u>)  The benefits of regular exercise were reviewed with him.  (<u>Id.</u> at 145.)  His dosage of a medication, Gabapentin, was increased.  (<u>Id.</u> at 146.)

On April 18, 2002, Plaintiff returned to the physical medicine rehabilitation clinic.  (<u>Id.</u> at 135-38.)  He described his pain as constant, sharp, stabbing, and of four to five years' duration.  (<u>Id.</u> at 137.)  It occurred in his low back and right hip.  (<u>Id.</u>)  It was caused or exacerbated by walking and was diminished by cold or hot packs and medication.  (<u>Id.</u>)  It was noted that earlier x-rays had revealed spondylolisthesis at L4-L5.  (<u>Id.</u>)  It was also noted that Plaintiff had been diagnosed with diabetes five years before and that the diabetes was not well controlled.  (<u>Id.</u>)  His dosages of Glyburide and Metformin were increased.  (<u>Id.</u>)  He was given a prescription for Vicodin to be taken as needed for pain.  (<u>Id.</u>)

Plaintiff went to the orthopedic clinic on July 30.  (<u>Id.</u> at 135.)  He reported that his left knee hurt when he climbed or walked up stairs.  (<u>Id.</u>)  He was not wearing his brace, although he reported that his knee was better when he did wear it.  (<u>Id.</u>)  His hands were slightly swollen, and he had some pain in his carpal metacarpal joints on palpation.  (<u>Id.</u>)

The diagnosis was tendinitis in the knee and osteoarthritis in the carpal metacarpal joints. (Id.) He was started on Indocin for both complaints. (Id.)

On August 16,[9] Plaintiff's diabetes was described as being in poor control in spite of a maximum amount of Glyburide and Metformin. (Id. at 132.) He reported having back pain since the 1980's. (Id.) It was painful for him to raise his right shoulder after throwing a ball two months before. (Id.) A decision whether to add any other oral diabetic medications was deferred. (Id.) Plaintiff did not want to start insulin. (Id.) Plaintiff received nutrition counseling on October 30 for control of his diabetes, including advice to reduce his caloric intake, particularly his high fat intake, and increase his activity. (Id. at 128-29.) It was noted that he had poor glycemic control and did not exercise due to back pain. (Id. at 128, 130.) The expectation that he would reduce his portion sizes and eat every four to five hours was low. (Id.)

Plaintiff went to the physical medicine rehabilitation clinic at the VA on December 20 with complaints of right shoulder discomfort for the past five months. (Id. at 125-26.) He was not able to raise his right arm to the same degree as his left. (Id. at 125.) It was thought he might have a partial tear in his rotator cuff. (Id.) He was to be seen at the orthopedic clinic. (Id.) Again, he reported no feelings of depression or hopelessness, lack of interest, or loss of pleasure in doing things. (Id. at 126.) An x-ray taken of his right

_____

[9]The day before, Plaintiff had gone to the ophthalmology clinic for his annual eye exam. (Id. at 133-35.) His visual acuity was 20/20 with correction. (Id. at 134.)

shoulder that same day showed no significant arthritic changes, no acute fractures, and no dislocations. (Id. at 178.)

On February 25, 2003, Plaintiff went to the orthopedic clinic with complaints of his left hip popping when he twisted his hip by placing his thigh on his knee and rotating the hip. (Id. at 123.) His right shoulder also hurt "with extreme upper elevation." (Id.) He had had an injection in that shoulder, but without much relief. (Id.) If his symptoms continued, an MRI was to be conducted. (Id.)

On April 3, Plaintiff returned to the VA to consult an occupational therapist for his concerns about numbness in his right upper extremity. (Id. at 122-23.) He also reported that he had been having minimal pain in his shoulder when throwing a ball. (Id. at 123.) The pain had increased the past summer and his range of motion had decreased. (Id.) He thought he had heard popping noises in his shoulder. (Id.) He did not have pain when at rest. (Id.) The therapist noted that Plaintiff appeared to be developing a frozen shoulder and decided to focus on range of motion exercises. (Id. at 122.) An MRI of his right shoulder conducted that same day revealed mild osteoarthritis of the acromioclavicular joint. (Id. at 177.) His rotator cuff was intact and there was no impingement. (Id.)

Plaintiff returned to the orthopedic department two weeks later for a follow-up. (Id. at 122.) He reported that the injection had helped. (Id.) He was informed that the MRI of his right shoulder had showed mild osteoarthritis but no joint effusion. (Id.) When asked the following week about his pain, Plaintiff answered, "enough." (Id. at 121.) Exercising more and checking his blood sugars more frequently were discussed. (Id.)

On September 30, Plaintiff underwent an MRI of his cervical spine. (Id. at 114-15.) The impression was of persistent mild degenerative disc disease.[10] (Id.)

A hearing test on November 13 revealed a mild hearing loss in Plaintiff's right ear and borderline normal hearing in his left ear. (Id. at 202, 204, 210.) There were no significant changes since his last evaluation, in September 1999. (Id.)

On January 15, 2004, Plaintiff consulted the physical medicine rehabilitation clinic about the pain in his right shoulder. (Id. at 207-10.) He was angry that no one believed the pain was as bad as it was. (Id. at 207.) The diagnosis was diabetes and degenerative arthritis in his cervical spine. (Id.) An additional medication was prescribed for his diabetic control, described as poor. (Id.) His blood sugars were in the range of 313. (Id.) His weight was 212 pounds. (Id. at 208.)

Three months later, he returned for an injection, explaining that he did not really need one but wanted to stay in the system in case he needed one later. (Id. at 214.) He continued to have pain in his right shoulder, but it was manageable. (Id.)

The records before the ALJ also included the report of a consultative examination performed in July 2003 by Michael J. O'Day, D.O. (Id. at 107-12.) Plaintiff informed Dr. O'Day that he was then taking two medications, Glucophage and Glucotrol. (Id. at 107.) He had had two surgeries on his right wrist for tendinitis. (Id.) "The surgeries were helpful." (Id.) Although he had had nerve conduction studies of both upper extremities, he had had

---

[10]The impression also reads that it was of "spondylitic," but the remainder of the sentence, including the noun that adjective refers to, is omitted.

"no firm diagnosis of entrapment neuropathy" and was told the diagnosis was tendinitis  (Id. at 107-08.)  "Currently he has no problems dropping objects but does indicate there is some unpleasant sensations of the long fingers of both hands on holding a steering wheel for lengthy periods of time."  (Id. at 108.)  He had had an arthroscopy on his left knee to repair a cartilage tear.  (Id.)  Plaintiff reported that "the surgery was quite helpful."  (Id.)  His right knee was intermittently painful, but he had not had any surgery on it.  (Id.)  He had a limited range of motion in his right shoulder and had been told he had arthritis in that shoulder.  (Id.) The limited range of motion affected his ability to reach, causing him problems with such tasks as combing his hair or reaching into cupboards.  (Id.)  He had also been told that he had arthritis in his cervical, thoracic, and lumbar spine.  (Id.)  He had had no epidural steroid injections.  (Id.)

On examination, he had 20/20 visual acuity with correction.  (Id. at 109.)  His knees, calves, and thighs were equal in circumference and his knees, ankles, and hips were not swollen.  (Id.)  His grip strength was normal, and there was no musculature atrophy in either hand.  (Id. at 109, 111.)  There was "some loss of active range of motion about the right shoulder due to discomfort particularly on internal rotation and flexion."  (Id.)  He had a limited ability to move his right wrist in a circular motion.  (Id. at 111.)  His neurological examination was normal.  (Id. at 109)  He had no unusual curvatures in his spine, but did exhibit a partial loss of reversal of the lumbar orthotic curvature.  (Id.)  He did "not complain much during active range of motion testing of the lumbar spine" and had a normal range of

motion in both his cervical and lumbar spines.  (Id. at 109, 112.)  His gait was unremarkable; he was able to squat independently.  (Id. at 109.)

Dr. O'Day's diagnosis was adult-onset diabetes without significant end organ damage, a history of probable mild osteoarthritic involvement of the cervical and possibly lumbar spines without compressive neuropathy and with reasonably full range of "virtually painless" motion in both spines, a history of reported surgeries of the right hand for some form of tendinitis but the scars were inconsistent with carpal-median nerve release, and probable osteoarthritis of the right shoulder with some loss of motion.  (Id. at 109-10.)  Dr. O'Day concluded that Plaintiff could stand and walk for a combined total of eight hours daily "with appropriate rest periods"; could sit for at least eight hours daily with those rest periods; could bend, stoop, crouch, squat, and kneel without restriction; and could occasionally lift and carry 25 to 35 pounds.  (Id. at 110.)  "[H]e probably could not do excessively forceful grasping, squeezing or torquing at the right hand/wrist given his surgical history."  (Id.)  He should also only occasionally do overhead and horizontal reaching with his right shoulder. (Id.)  Dr. O'Day noted that Plaintiff climbed two flights of stairs after leaving his office in preference to taking the nearby elevator.  (Id.)

After Dr. O'Day issued his report, Megan Parham, a counselor with the State of Missouri's Section of Disability Determinations, completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff.  (Id. at 68-76.)  She listed diabetes mellitus as the primary diagnosis; mild osteoarthritis of the right shoulder and cervical and lumbar spines as the secondary diagnoses; and a history of left knee arthroscopy as an additional

alleged impairment.  (Id. at 68.)  She assessed Plaintiff's exertional limitations as being able to occasionally lift 50 pounds, to frequently lift 25 pounds, and to stand, walk, or sit for 6 hours during an 8-hour workday.  (Id. at 69.)  His only manipulative limitation was in reaching all directions, including overhead.  (Id. at 72.)  He had no postural, visual, communicative, or environmental limitations.  (Id. at 71-73.)

## The ALJ's Decision

The ALJ found that Plaintiff had degenerative disc and joint disease in his lumbar and cervical spines; obesity; diabetes mellitus; moderate chondromalacia in his knees; and a history of a left knee meniscus tear surgically repaired, but did not have an impairment or combination thereof that met or equaled in duration or severity the requisite criteria.  (Id. at 8-9.)

Noting that Plaintiff had to establish that he was disabled before his insured status ended on December 31, 2000, the ALJ considered the medical evidence after that date as relevant insofar as it reflected the severity of his condition as of the date he was last insured.  (Id. at 9.)  The ALJ then addressed the question of Plaintiff's credibility.

After summarizing the factors to be considered when evaluating that credibility, the ALJ found that the medical records did not support his allegations about his hearing loss.  (Id. at 9-10.)  The ALJ also noted that "the medical record does not document mental health treatment aggressively sought and received" or any "ongoing observations of significant deficits and abnormalities in function, related to a mental impairment, by a treating physician or psychologist."  (Id. at 10.)  The medical record did document instances of Plaintiff

disclaiming any feelings of depression or hopelessness. (Id.) Accordingly, the ALJ concluded, any mental impairment of Plaintiff's had, before December 31, 2000, at most a mild limitation on his social functioning, activities of daily living, abilities to cope with stress and adapt to change, and abilities to work without decompensation and with concentration, persistence, and pace. (Id.)

Additionally, neither Plaintiff's diabetes nor his obesity imposed any significant limitations and was not a severe impairment. (Id. at 10-11.) The medical records did document treatment for complaints of upper and lower back pain, neck pain, leg and knee pain, shoulder and elbow pain, bilateral hand and knee pain, numbness and tingling in his hands and legs, and limited use of hands. (Id. at 11.)

After detailing Plaintiff's medical treatment and clinical findings from 1994 to February 1999, the ALJ observed:

> [T]he above noted medical treatment records from June 1994 through February 1999, [sic] establish that, [sic] despite the claimant's many complaints, the clinical test results and the many medical objective tests revealed generally negative straight leg raises, normal coordination, good strength, no wasting or atrophy, generally normal motion, good grips and only slight and mild degenerative disc disease and degenerative joint disease in the cervical spine. The above findings fail to enhance the claimant's credibility regarding any allegations of disabling back, neck, hand and extremity pain.

(Id. at 13.)

The ALJ further noted that Plaintiff's straight leg raises in March 1999 were negative in both the lying and seating positions despite his claim of a 75 percent restriction in lumbar motion. (Id.) His crossed leg testing was also negative. (Id.) He considered these findings

"especially significant" in light of the EMG and nerve conduction studies that revealed no abnormalities. (Id.) Neither the walking stick nor cane occasionally used by Plaintiff was prescribed, nor did the medical records support a need for either. (Id. at 14) His allegations of knee pain and right ankle discomfort were attributed by Plaintiff to a 1988 accident, yet he worked on a farm from 1997 through 1999. (Id.) And, regardless of his complaints of back, knee, and ankle pain, Plaintiff was able to walk well and walk on his heels and toes in May 2001. (Id. at 14-15.) After further summarizing the medical records, the ALJ continued:

> Thus, the undersigned finds that the above noted treatment notes from March 1999 through December 2001, and beyond, indicate degenerative disc disease with no significant herniation or stenosis within the lumbar spine, only mild degenerative disc and joint disease in the cervical spine, only mild changes in the right shoulder and only after the date last insured, no rheumatoid arthritis, no significant arthritis within the joints, the absence of a medically determinable impairment of the hands, and the claimant's abilities to walk well, move his extremities well and move his cervical and lumbar spines well. The above records indicate the absence of atrophy but the general presence of full strength. The claimant exhibited inconsistencies with regard to spinal motion. The above records indicate the continued absence of a medically determinable hand impairment. The above treatment notes indicate no severe shoulder impairment prior to the date last insured or any ongoing and severe epicondylitis imposing significant limitations of function for twelve consecutive months after onset and through the date last insured. The above medical records indicate the absence of any severe hearing impairment, severe mental impairment or severe symptoms and complications arising from obesity and diabetes. Finally, the above noted medical records are inconsistent with claimant's allegations of severe and disabling pain and limitations of motion and function.

(Id. at 15.)

Also inconsistent with Plaintiff's allegations was his "significant non-compliance[.]" (Id. at 16.) He failed to keep appointments, refused taping of his knees, did not exercise as instructed, did not lose weight as instructed, and refused to participate in a physical therapy evaluation, informing the therapist that the pain went away on its own. (Id.) Moreover, a psychological examination in April 1994 described him as "pain-focused." (Id.) At various times, Plaintiff reported that he wanted disability, exhibiting "a substantial degree of benefit motivation." (Id. at 16-17.) And, the medical records did not reflect any worsening of his condition as of the alleged onset date in August 1999 or as of the date he was last insured. (Id. at 17.) Nor did those records indicate that any physician recommended that he stop working or that there were any side effects from medication he was taking. (Id.) Also detracting from Plaintiff's credibility were the sporadic nature of his earnings after 1992. (Id. at 18.)

Next addressing the question of Plaintiff's residual functional capacity, the ALJ found as follows:

> [C]laimant's impairments [from the alleged onset date through December 31, 2000] precluded, at most: standing and/or walking more than six hours in an eight hour work day; sitting more than more than six hours in an eight hour work day; frequently lifting more than ten pounds; occasionally lifting more than twenty pounds; more than very frequent use of stairs, ramps and ladders; more than occasional kneeling, crawling and crouching; and frequent use of scaffolds and ladders. As noted above, the record does not support finding of the medical necessity of a cane on an ongoing basis, for twelve consecutive months prior to and since the date last insured. The record does not document severe hearing loss precluding good speech discrimination or the ability to speak and hear despite hearing aids. The record does not document severe diabetic and/or obesity related complications and symptoms.

> The record does not establish a severe medically determinable mental impairment prior to the date last insured.

(<u>Id.</u> at 18.) Plaintiff was limited to light work before December 31, 2000; his non-exertional limitations did not significantly reduce the range of that work. (<u>Id.</u>) He could not, however perform his past relevant work. (<u>Id.</u>) Shifting the burden to the Commissioner to show that there were other jobs in significant numbers in the national or local economies that Plaintiff could perform, the ALJ found that there were such jobs based on the Medical-Vocational Rules, specifically Rules 201.21 through 201.22 and 202.20 through 202.22 (<u>Id.</u> at 19.)

Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

## <u>Legal Standards</u>

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. § 404.1520. <u>See</u> <u>also</u> **Johnson v. Barnhart**, 390 F.3d

1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002);

**Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be

presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second,

the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social

Security Act defines "severe impairment" as "any impairment or combination of impairments

which significantly limits [claimant's] physical or mental ability to do basic work

activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated

at step two only when the claimant's impairment or combination of impairments would have

no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d

603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether

the claimant has a severe impairment which meets or equals one of the impairments listed

in the regulations and whether such impairment meets the twelve-month durational

requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the

claimant meets this requirement, he is presumed to be disabled and is entitled to benefits.

**Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity

["RFC"] and the physical and mental demands of the work [claimant has] done in the past."

20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite

limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th

Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability

merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual

determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

In his initial brief, Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole, specifically because it fails to properly address his VA award of total disability. The Commissioner counters that the ALJ properly considered the evidence on which that award was based and properly evaluated Plaintiff's credibility. In his reply brief, Plaintiff disagrees, arguing, inter alia, that the ALJ also improperly evaluated his credibility, specifically by not giving sufficient weight to his earnings record, persistent search for medical treatment, and complaints of pain consistent with the medical.

Credibility. As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972). "The ALJ need not explicitly discuss each Polaski factor." **Strongson**, 361 F.3d at 1072. "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." **Id.** Accord **Lowe**, 226 F.3d at 972.

In the instant case, the ALJ evaluated Plaintiff's credibility and discounted it based on several Polaski factors, including the lack of supporting objective evidence. This omission is a proper consideration. See **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment);

**Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Plaintiff cites various portions of the medical records in support of his contention that the objective medical evidence supports his credibility. Those records repeat Plaintiff's descriptions of his pain; the clinical tests and findings, e.g., the EMG's and the straight leg raises, consistently fail to support his descriptions. The ALJ could properly determine that Plaintiff's descriptions of his pain when being treated were no more credible than at the hearing.

The ALJ also properly considered the lack of any restrictions placed on Plaintiff's activities by his treating physicians when evaluating the severity of his symptoms. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physical restrictions placed on claimant by physician militated against finding of total disability); **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (subjective complaints of pain were properly discounted on grounds that, inter alia, they were inconsistent with absence of medically ordered commensurate restrictions on claimant's activities); **Shelton v. Chater**, 87 F.3d 992, 996 (8th Cir. 1996) (record supported statements concerning pain as a general matter but not to severity and degree of which claimant complained; recommendations of doctors were devoid of any restrictions and were of conservative treatment; and limited activities were result of lifestyle choices, not medically necessitated limitations). The medical records do include many references to appointments not kept, recommended treatment rejected, instructions

ignored, and misleading answers about test findings and previous diagnoses. These references were properly considered by the ALJ when assessing Plaintiff's credibility. See **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (affirming ALJ's credibility decision based in part on claimant's medical non-compliance); **Raney v. Barnhart**, 396 F.3d 1007, 1100 (8th Cir. 2005) (affirming ALJ's credibility decision based on non-compliance with dietary regime and medication).

As noted by Plaintiff, a good work history does militate in favor of a claimant's credibility. See **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998). Plaintiff's 20-year military service favors his credibility. That service ended, however, in June 1992. Plaintiff had no reported earnings from that date until 1997, yet his alleged disability onset date, the date when he alleged both that his impairments first started bothering him and that they prevented him from working, was August 1999. The ALJ properly considered this gap when evaluating Plaintiff's credibility.

As noted by Plaintiff, he has a sedentary lifestyle consistent with his allegations of disabling pain. An "ALJ [is] not obligated to accept all of [a claimant's] assertions concerning" limitations of daily activities. **Ostronski v. Chater**, 94 F.3d 416, 418-19 (8th Cir. 1996) (alterations added).

The ALJ also cited the various and consistent references in the medical records to remarks by Plaintiff about applying for disability. The hope of secondary gain is a proper consideration when assessing a claimant's credibility. See **Eichelberger v. Barnhart**, 390 F.3d 584, 590 (8th Cir. 2004); **Gaddis v. Chater**, 76 F.3d 893, 896 (8th Cir. 1996).

At issue in the present case is not whether Plaintiff suffers pain, but whether that pain precludes him from substantial gainful activity. The ALJ determined that it did not; this determination is supported by the record.

The VA Award. The VA rated the combination of Plaintiff's various service-connected impairments to be 100 percent disabling. This finding is not binding on the ALJ. See 20 C.F.R. § 404.1504; **Jenkins v. Chater**, 76 F.3d 231, 233 (8th Cir. 1996); **Fisher v. Shalala**, 41 F.3d 1261, 1262 (8th Cir. 1994) (per curiam). "[A] VA finding [is, however,] important enough to deserve explicit attention." **Morrison v. Apfel**, 146 F.3d 625, 628 (8th Cir. 1998) (alterations added).

Plaintiff challenges the ALJ's failure to explicitly address the VA's rating in his thirteen-page, single-space, detailed decision. Similarly, the claimant in **Pelkey v. Barnhart**, 433 F.3d 575 (8th Cir. 2006), argued that the ALJ had improperly failed to consider the VA's rating decision of a 60 percent disability. **Id.** at 579. The Eighth Circuit disagreed, noting that "the ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits." **Id.** See also **Andler v. Chater**, 100 F.3d 1389, 1391 n.3 (8th Cir. 1996) ("[T]he standards for VA disability do not mirror those for Social Security disability.") (alteration added). The court in **Pelkey** held that the ALJ's failure to specifically mention the VA's rating decision was not fatal "because [the ALJ] fully considered the evidence underlying the VA's final conclusion that [the claimant] was 60 percent disabled." 433 F.3d at 579. In so holding, the court specifically rejected the claimant's argument that **Morrison** mandated an express reference

- 43 -

to the VA's rating decision. **Id.** Rather, **Morrison** required explicit *attention* to the VA's rating decision and that requirement was not met by the ALJ's *implicit* rejection of the decision that, together with an extensive physical examination, comprised thirty pages in the record. **Id.**

In the instant case, Plaintiff does not dispute that the ALJ fully considered the evidence underlying the VA's rating decision or that the evidence on which the VA based its decision to increase that rating to 100 percent was in 2002 and 2003, at least one year before Plaintiff was last insured. Instead, Plaintiff focuses on the rating decision in **Pelkey** being a 60 percent disability compared to his 100 percent disability rating. This is a distinction without a difference. The medical records indicate the earlier VA rating was 60 percent. It was increased to 100 percent after the 2002 and 2003 medical records were considered. Additionally, the Court notes that the 100 percent disability rating was based in part on impairments that are not at issue, e.g., a fractured nose and tinnitus. See, e.g., **Cakora v. Barnhart**, 67 Fed.Appx. 983, 985 (8th Cir. 2003) (per curiam) (rejecting claimant's challenge to ALJ's rejection of VA's rating decision in case in which record reflected that the ALJ had reviewed and considered medical evidence on which record was based); **Brown v. Massanari**, 21 Fed.Appx. 541, 542 (8th Cir. 2001) (per curiam) (holding that ALJ's failure to explicitly discuss VA's two-page rating decision was inconsequential because underlying findings were not supported in record before the ALJ).

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of August, 2006.